[Cite as *State v. Taylor*, 2016-Ohio-5862.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                              Court of Appeals No. L-15-1151

      Appellee                                          Trial Court No. CR0201402544

v.

Michael Taylor, Jr.                                       **DECISION AND JUDGMENT**

      Appellant                                         Decided:  September 16, 2016

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, David F.
Cooper and J. Christopher Anderson, Assistant Prosecuting Attorneys,
for appellee.

Tim A. Dugan, for appellant.

* * * * *

**SINGER, J.**

{¶ 1} Appellant, Michael Taylor Jr., appeals the May 14, 2015 judgment of the

Lucas County Court of Common Pleas convicting him of two counts of aggravated

murder with firearm specifications on each count.  For the reasons that follow, we affirm.

{¶ 2} Appellant sets forth two assignments of error:

1) The Trial Court erred in allowing the State of Ohio to present inadmissible hearsay without first independently proving a conspiracy.

2) Appellant's convictions for Aggravated Murder fell against the manifest weight of the evidence.

## Background

{¶ 3} This case centers around the murders of three young men, two of whom were very closely associated with appellant. Ultimately, appellant was charged with and convicted of the murders of those two men.

{¶ 4} The first murder was that of Darren Smith. Darren, of the Overton family, was killed on April 24, 2010, in approximately the 1300 block of Grand Avenue, in Toledo, Ohio. At that time, appellant lived at 1346 Grand with his sons, Michael Taylor III ("Michael III") and Montelle Taylor. On May 7, 2010, Michael III, appellant's oldest son, was charged with Darren's murder, and on January 27, 2012, convicted of Darren's murder. Thereafter, Michael III was sentenced to 18 years to life in prison.

{¶ 5} The second murder occurred during the early morning hours of June 10, 2011. Sergeant Daniel Raab, with the Toledo Police Department, responded to a dispatch concerning a man found lying in the street. Sergeant Raab discovered Montelle, appellant's youngest son, partly on the curb and partly on the street at West Bancroft and Auburn, in Toledo Ohio. Montelle was alive but had a serious gunshot wound to his body. According to his testimony, Sergeant Raab asked Montelle where he was shot and

2.

Montelle pointed down the street. Sergeant Raab then asked Montelle who shot him. While gasping for breath, Montelle responded, "Little Chris." Sergeant Raab asked Montelle a second time who the shooter was and Montelle stated, "Chris" and what sounded like "No-Veley." Sergeant Raab later learned Chris Snow-Veley was the name associated with Little Chris. Montelle died while being transported to nearby Toledo Hospital. Montelle was officially pronounced dead at 1:45 a.m.

{¶ 6} This same Chris or Christian Snow-Veley was the victim of the third murder. Although appellant and Snow-Veley were unrelated, appellant treated Snow-Veley, who was a longtime friend to both Montelle and Michael III, as if he was another son.

{¶ 7} According to the testimony of appellant's brother, Vincent Witcher, Snow-Veley was killed on May 27, 2013, by appellant and Elijah "Ratchet" Dyer ("Ratchet"), during a Memorial Day party held at appellant's house at 263 East Hudson Street in Toledo, Ohio. After Snow-Veley was killed, his body was placed in a director's chair then put in the shower in the basement. Snow-Veley's body was then moved several times until it was left at an abandoned house on Streicher Street.

{¶ 8} On July 31, 2013, two workers discovered the decomposed remains of a body in the stairway of an abandoned house on Streicher. A Lucas County Deputy Coroner testified she discovered eight bullets in the corpse found at the abandoned house. The eight bullets were from two different guns. An expert in the field of forensic

3.

odontology, after comparing dental records of the remains to Snow-Veley's dental records, concluded the remains were indeed Snow-Veley.

{¶ 9} Prior to these murders and over the course of several years, appellant had taken out numerous life insurance policies on Montelle, Snow-Veley and Michael III.

{¶ 10} On August 1, 2014, Christian Jackson, who was friends with Snow-Veley and closely associated with appellant, was indicted for the murder of Montelle. A year later, Jackson entered a guilty plea pursuant to *North Carolina v. Alford*, 400 U.S. 25, 37, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), to one count of involuntary manslaughter and was sentenced to three years in prison.

{¶ 11} On September 26, 2014, appellant was indicted on two counts of aggravated murder, for the murders of Montelle and Snow-Veley. Each count had an attendant firearm specification. In the same indictment, Ratchet was charged with one count of murder, for Snow-Veley's murder, with a firearm specification. Appellant and Ratchet entered pleas of not guilty

{¶ 12} Appellant's jury trial commenced on May 5, 2015. Numerous witnesses were called to testify. On May 14, 2015, the jury found appellant guilty of two counts of aggravated murder, in violation of R.C. 2903.01(A) and (F), and two firearm specifications. He was sentenced to two consecutive terms of life in prison without the possibility of parole and a mandatory three years for each gun specification.

{¶ 13} In August 2015, Ratchet was charged by information with one count of involuntary manslaughter, one count of tampering with evidence, one count of

4.

obstructing justice and one count of abuse of a corpse. Ratchet entered a plea of no contest to the four counts of the information, and the one count of murder was nolled at sentencing. Ratchet was sentenced to 18 years in prison.

## Analysis

### First Assignment of Error

{¶ 14} Appellant contends the trial court erred in allowing the state to present inadmissible hearsay without first independently proving a conspiracy. Appellant claims the state presented the testimony of Shawntia Williams as to what Snow-Veley told her before the state presented independent evidence of a conspiracy between appellant, Jackson and Snow-Veley to kill Montelle for money. Appellant insists neither Williams' testimony about what Snow-Veley said nor Jackson's later testimony independently proved a conspiracy to kill Montelle.

{¶ 15} The state counters overwhelming independent proof of the conspiracy to kill Montelle and Snow-Veley was presented, including appellant's statements and various witness testimony. The state maintains Snow-Veley's statements were admissible under Evid.R. 801(D)(2)(e).

{¶ 16} While appellant was not charged with conspiracy to commit aggravated murder, the state may prove a conspiracy in order to introduce out-of-court statements by co-conspirators even though the offense of conspiracy has not been charged. *See State v. Robb*, 88 Ohio St.3d 59, 68, 723 N.E.2d 1019 (2000).

5.

{¶ 17} A conspiracy exists when two or more people plan or agree to commit a crime, along with an overt act which is substantial enough to show an intention to carry the conspiracy through to completion. *See* R.C. 2923.01.

{¶ 18} Evid.R. 801(D)(2)(e) provides that statements of a co-conspirator are not hearsay if the statements were made by the co-conspirator during and in furtherance of the conspiracy. However, the early admission of statements which may otherwise constitute inadmissible hearsay is "rendered harmless, [when] independent proof of the conspiracy [is] admitted into evidence before the case [is] submitted to the jury." *State v. Jalowiec*, 91 Ohio St.3d 220, 227, 744 N.E.2d 163 (2001). Pursuant to Evid.R. 801(D)(2)(e), the statements of a co-conspirator are not admissible until the state has made "a prima facie showing of the existence of the conspiracy by independent proof." *State v. Carter*, 72 Ohio St.3d 545, 550, 651 N.E.2d 965 (1995). *See also State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 100.

{¶ 19} Independent proof of a conspiracy includes phone records which are consistent with communication between co-conspirators on the day of the crime, witness testimony that co-conspirators were seen together on the day of the crime and jail phone records of calls by one co-conspirator to a phone number of a co-conspirator, as well as the phone bill of that co-conspirator, indicating the phone calls were made from the jail. *State v. Weimer*, 11th Dist. Lake No. 2013-L-008, 2013-Ohio-5651, ¶ 58; *State v. Flores*, 6th Dist. Wood No. WD-04-046, 2005-Ohio-5254, ¶ 16.

6.

{¶ 20} Here, the record shows that early in appellant's trial, the state called Williams to testify before Jackson testified due to scheduling issues. Williams testified that during the early morning hours of June 10, 2011, she was asleep at her apartment at Swan Creek Apartments on Airport Highway when she received a phone call from Snow-Veley. In response to that call, Williams drove to Ottawa Drive to pick up Snow-Veley. She waited for about ten minutes before Snow-Veley appeared with Jackson. Snow-Veley appeared to be acting normally but Jackson seemed a little edgy. Williams then drove the men back to her apartment where they stayed until later that morning.

{¶ 21} Appellant's counsel objected to the state's line of questioning of Williams regarding a conversation between Williams and Snow-Veley which occurred several months after Montelle's death. At the time of the objection, it was anticipated that Williams would testify that Snow-Veley told her that appellant would pay Snow-Veley and Jackson $10,000 each from an insurance policy for killing Montelle. Appellant's counsel objected to the questioning on the grounds that it was hearsay and did not pertain to the conspiracy or the furtherance of the conspiracy. In addition, counsel asserted, pursuant to Evid.R. 801(D)(2)(e), independent proof of a conspiracy must first be established before statements from a co-conspirator can be admitted.

{¶ 22} Initially, the trial court sustained the objection on foundational grounds, but allowed the state to question Williams further. After additional questioning, the state asked Williams what Snow-Veley had told her. Appellant's counsel again objected, but

7.

the objection was overruled. Williams testified appellant was supposed to pay Snow-Veley for killing Montelle and appellant had made payments to Snow-Veley "now and then, but I guess it wasn't enough for Christian [Snow-Veley]." Snow-Veley grew angrier over time at appellant and threatened to kill appellant if appellant did not pay Snow-Veley all of the money.

{¶ 23} After Snow-Veley went missing in May 2013, Williams thought appellant had done something to Snow-Veley. Williams said Snow-Veley knew appellant would cause harm to Snow-Veley someday.

{¶ 24} It is undisputed that Williams' testimony about her conversation with Snow-Veley was presented before the state established the existence of the conspiracy. Ideally, this testimony should have been presented after the state established a conspiracy existed. Nevertheless, so long as independent proof of the conspiracy was submitted before the case went to the jury, Williams' testimony was properly admitted by the trial court. Thus, the issue becomes whether the state made a prima facie showing of the existence of the conspiracy by independent proof.

{¶ 25} A review of the record shows the following evidence was adduced at trial.

{¶ 26} Toledo Police Officer Kristi Eycke testified she responded to the crime scene at Bancroft and Auburn on June 10, 2011, and was directed to ride in the ambulance with Montelle. Eycke believed Montelle died in the ambulance on the way to Toledo Hospital. Upon arrival at the hospital, Eycke stayed with Montelle's body. At some point, Eycke was informed appellant was also at Toledo Hospital, being treated for

8.

a stomach issue in the emergency room. Eycke did not make contact with appellant. Rather, she remained with Montelle's body for about half an hour or 45 minutes, until she was relieved by Detective Gene Kutz.

{¶ 27} Toledo Police Detective Kutz testified he went to Toledo Hospital on June 10, 2011 to investigate an individual who was shot. When Kutz arrived at the hospital he learned Montelle was pronounced dead at 1:45 a.m. Kutz was made aware that Montelle's family was at the hospital, and later, at about 3:30 a.m., Kutz met with appellant and Montelle's mother and notified them of Montelle's death. Montelle's mother was inconsolable while appellant did not appear distraught.

{¶ 28} Kutz testified appellant told him what had transpired earlier in the evening. Appellant said he was at his house with his son, when around 12:26 a.m. to 12:35 a.m., appellant drove himself to the hospital due to stomach ailments. When appellant left the house, Montelle was on the porch talking to a black male on a bicycle. Montelle was on house arrest and was not supposed to leave the house.

{¶ 29} Phyllis Riley, Montelle's maternal grandmother, testified she lived in Detroit, Michigan, and got a call on June 10, 2011, at about 1:00 a.m. or 2:00 a.m., from her daughter who said to get down to Toledo because Montelle had been shot. When Riley arrived at Toledo Hospital, she saw her daughter and family, and was informed by a nurse that Montelle was deceased. Riley saw Montelle, then encountered appellant. She asked appellant where he had been and appellant said he was sick. Appellant said, "don't worry about it because I have a [insurance] policy. Appellant put on a fake cry

and said, "I am so upset. You guys take care of this." Riley told appellant to do it himself as "[t]his is your baby." When Riley said this, appellant's fake tears stopped.

{¶ 30} Riley recalled in the first part of 2011, Montelle called her to tell her that he had gone out to breakfast with appellant and then had a physical. Montelle also said his dad had taken him for an insurance policy. Riley asked to speak to appellant and asked appellant how Michael III was doing, because he was in jail. Appellant said Michael III was doing okay and that is why appellant bought this insurance policy for Montelle "[i]n case something happened to him." Appellant said he made Montelle's mother the beneficiary of the life insurance policy on Montelle. Riley asked to speak with Montelle again and told Montelle to watch his back. Riley described appellant's relationship with Montelle and Michael. Appellant "has not been a role model father" and did not buy clothes for Montelle, provide a bed or properly care for Montelle. Appellant bought new clothes for Michael III and Michael III "was like the prodigal son."

{¶ 31} The state questioned Witcher, appellant's brother, about when appellant informed Witcher that Montelle had died. Witcher testified appellant called Witcher "[a]bout a little after one * * * 1:30 around that area" and told Witcher that Montelle had gotten shot and killed. Witcher remembered he wanted to buy beer at Petro's at Auburn and Monroe and the store closed at 1:00 a.m. Witcher was able to buy the beer and return to Fernwood, where he was living in an abandoned house owned by appellant, when he received the call. Witcher described Montelle as kind of slow.

10.

{¶ 32} Williams testified concerning events which occurred within hours after Montelle's murder, including receiving a phone call from Snow-Veley, and in response, driving to pick him and Jackson up at Ottawa Drive, about a block away from Petro's.

{¶ 33} Ashley Smith testified she knew appellant, Montelle, Snow-Veley, Jackson, Witcher and Ratchet. Smith used to stay on Grand and the neighborhood was not safe. On the evening of June 10, 2011, Ashley drove by the Bancroft and Auburn area when she saw a lot of commotion, with people screaming. While stopped at the corner of Bancroft and Auburn, she saw a person on the ground and a person fleeing, running across the parking lot away from Auburn. The person running across the lot looked like Snow-Veley. When Ashley was interviewed by police in 2011 she said Snow-Veley had a handgun in his left hand. At trial, however, she did not remember that Snow-Veley was carrying anything when she saw him.

{¶ 34} Mary Taylor testified she had lived on Grand with appellant and her children but the house was burned down. She described Grand as very dangerous with "[b]ullets flying everywhere."

{¶ 35} Mary said Montelle was like a son to her. Just before Montelle was murdered, Mary and appellant had gotten into an argument because appellant was spending so much time and money on Michael III's murder case. On June 10, 2011, at about 4:00 or 5:00 a.m., appellant woke up Mary at her house on Clay Street and told her that Montelle had been killed. Appellant was crying. Mary screamed and cried and called her sister, Andrea Ankney. Ankney came over and eventually left, driving

11.

appellant somewhere. Later, appellant told Mary he had gone out to talk with Snow-Veley.

{¶ 36} Ankney testified she is Mary's cousin, but they are more like sisters. On the morning of June 10, 2011, Mary called Ankney to say that Montelle had been killed. Ankney drove over to pick up Mary and appellant, and Mary was crying but appellant was not. Appellant was on his phone trying to get in contact his attorney so the attorney could accompany appellant downtown for questioning by the police about Montelle's death.

{¶ 37} Ankney testified Mary asked her to take appellant somewhere, so Ankney drove appellant to "the baby mother of Christian Snow-Veley out to Swan Creek apartments on Airport Highway." Ankney waited in the car for appellant for over an hour.

{¶ 38} Tenille Galloway, appellant's former girlfriend and the mother of his daughter, Sidney Galloway, testified that shortly after Montelle's death, appellant notified her that she and Sidney were beneficiaries of the proceeds of two life insurance policies on Montelle. Tenille never took out life insurance policies on Montelle nor did she ever name herself as a beneficiary of a life insurance policy on Montelle. Tenille did, however, receive an $80,000 payout from the life insurance policies on Montelle following his death.

{¶ 39} The state offered into evidence at least eleven life insurance policies on Montelle for which appellant had applied.

12.

{¶ 40} In addition, the state introduced a surveillance video taken at the time of the shooting. The parties stipulated to the video. The video camera was located in the back parking lot near where Montelle was shot. The video shows three people walking together, then less than a minute later, two people are running in the opposite direction from where the three people were walking. Jackson was shown the video at trial and identified himself, Montelle and Snow-Veley as the three people shown walking in the video and then himself and Snow-Veley running because Montelle was just shot.

{¶ 41} The state also presented three videotapes of appellant being interviewed by police.

{¶ 42} Based upon the foregoing, we find the state made a prima facie showing of the existence of a conspiracy between appellant, Snow-Veley and Jackson to murder Montelle by independent proof. Specifically, there was evidence that appellant knew about Montelle's death before he was informed by the police, Snow-Veley was identified running away from the area of Montelle's murder just after the murder occurred, Snow-Veley was with Jackson shortly after Montelle's murder and not far from the murder scene, after Montelle's murder appellant met with Snow-Veley and Jackson, appellant applied for numerous life insurance policies on Montelle, appellant's former girlfriend received money from insurance policies after Montelle's death, appellant tried to contact a lawyer before talking with police about Montelle's murder, and appellant did not seem upset by Montelle's death. As there was sufficient independent evidence of a conspiracy, Williams' testimony regarding what Snow-Veley told her is admissible under Evid.R.

801(D)(2)(e).  Therefore, the trial court did not err in admitting Williams' testimony.  For the foregoing reasons, appellant's first assignment of error is not well-taken.

**Second Assignment of Error**

Appellant's convictions for aggravated murder were against the manifest weight of the evidence.

{¶ 43} The standard of review for manifest weight is the same in a criminal case as in a civil case, and an appellate court's function is to determine whether the greater amount of credible evidence supports the verdict.  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12; *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).  "A manifest weight of the evidence challenge contests the believability of the evidence presented."  (Citation omitted.)  *State v. Wynder*, 11th Dist. Ashtabula No. 2001-A-0063, 2003-Ohio-5978, ¶ 23.  When determining whether a conviction is against the manifest weight, the appellate court must review the record, weigh the evidence and all reasonable inferences drawn from it, consider the witnesses' credibility and decide, in resolving any conflicts in the evidence, whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *State v. Prescott*, 190 Ohio App.3d 702, 2010-Ohio 6048, 943 N.E.2d 1092, ¶ 48 (6th Dist.), citing *Thompkins* at 387.

{¶ 44} It has long been held that the weight to be given to the evidence and the credibility of the witnesses is primarily for the trier of fact to decide.  *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1992).  When reviewing a manifest weight of the

14.

evidence challenge, an appellate court sits as the "thirteenth juror." *Prescott* at ¶ 48, citing *Thompkins* at 387.

## Montelle's Murder

{¶ 45} Appellant asserts evidence was presented at his trial regarding a murder he did not commit—the murder of Darren Smith. Appellant contends at times it appeared as if the state was relitigating Michael III's murder trial.

{¶ 46} Appellant also argues the state's main theory connecting him to Montelle's murder was that appellant had Montelle killed for the life insurance proceeds. Appellant maintains he never received any money from the life insurance taken out on Montelle. Appellant submits the state believed the dates when the life insurance policies were taken out were the main indicator that appellant wanted Montelle dead. Appellant notes the state claims he took out life insurance policies in late August 2010, after Michael III's bond was revoked and then increased, to raise money for Michael III's defense. Appellant observes at that time, Michael III had appointed counsel so appellant did not have to raise funds for Michael III's defense. Appellant further argues the state's witnesses testified appellant never received any money from the life insurance policies which paid out, and none of that money was spent on Michael III's defense.

{¶ 47} Appellant further contends his murder conviction for Montelle was based on hearsay statements of Snow-Veley and Christian Jackson's self-serving testimony.

15.

{¶ 48} In addition to the evidence set forth in the background section above, as well as the evidence included in the analysis under the first assignment of error, the record contains the following evidence in relation to Montelle's murder.

{¶ 49} Christian Jackson testified he met Michael III when they were in the Ohio Department of Youth Services ("DYS") in 2007, then met appellant. After Jackson was released from DYS, he went to appellant's house on Grand. Jackson was then sent to prison for 18 months. After being released from prison, Jackson again went to appellant's house on Grand. Later, Jackson was sent to the Corrections Center of Northwest Ohio ("CCNO") for six months. After being released from CCNO, Jackson returned to appellant's house on Grand.

{¶ 50} While living at appellant's house on Grand, Jackson would do jobs for appellant like beating people up and robbing people. Appellant would compensate Jackson with clothes and cash. Jackson would do most of the jobs by himself, but sometimes he did jobs with Michael III or Snow-Veley.

{¶ 51} Jackson met Snow-Veley in elementary school. In June 2011, Jackson would see Snow-Veley at appellant's house three or four times a week. Snow-Veley did the same kind of work for appellant as Jackson did.

{¶ 52} Jackson described Montelle as goofy, silly, loud and harmless. Appellant treated Montelle like a burden and would call Montelle names, like slow. Jackson never saw appellant treat Montelle in a violent way, but did see Michael III act violently toward

16.

Montelle two or three times.  Appellant treated Michael III differently, "you could just tell it was love * * * [i]t was mutual respect."

{¶ 53} Jackson knew Darren Smith "from being on Grand."  Appellant did not like Darren and did not want Jackson spending time with Darren, so Jackson went behind appellant's back and hung out with Darren.  Montelle also liked Darren and spent time with him.

{¶ 54} On April 24, 2010, Jackson was on Grand when Michael III shot Darren. Darren fell in the street and Michael III took off.  Minutes later, appellant appeared at the scene and talked with police.  Jackson talked with the police, but lied.  Montelle also the saw the shooting but he did not talk to the police.

{¶ 55} After Michael III was arrested, appellant "was real pressed" to get Michael III out of jail.

{¶ 56} Snow-Veley told Jackson that appellant wanted Snow-Veley to kill Montelle for some insurance money to bond Michael III out of jail and go to Florida. Snow-Veley told Jackson "I'm going to cut you in, bro."

{¶ 57} Jackson "pretty much knew" Montelle would be killed June 10, 2011. Jackson talked with appellant "[a]bout a robbery we was going to do" and Montelle was invited to go along.  However, Jackson, appellant and Snow-Veley had a conversation without Montelle "about money, and it was about Montelle getting killed."  Appellant handed Snow-Veley a gun.

17.

{¶ 58} Montelle, Jackson and Snow-Veley left appellant's house about 20 minutes after midnight on June 10, 2011. Appellant had already left the home to "get on camera" at a hospital. Jackson described the route the trio took until Montelle was shot by Snow-Veley. Montelle took off running after he was shot and was chased by Snow-Veley, who fired a couple more shots. Jackson and Snow-Veley left and made their way to Petro's. The men went to a duplex on Bluff Street then were picked up by Williams and taken to her house on Airport. Jackson slept in the living room and when he woke up, appellant was at the apartment talking with Snow-Veley. Jackson identified himself, Montelle and Snow-Veley on the surveillance video.

{¶ 59} Sometime after Montelle was killed, appellant asked Jackson to kill Snow-Veley because "Snow-Veley was running his mouth and * * * if Christian didn't get shut up then everyone was going to be locked up for life for Montelle's death." Appellant handed Jackson a pistol. Appellant told Jackson that Snow-Veley was owed some money and a house and if Jackson killed Snow-Veley, Jackson would get the money, house and maybe a car. Jackson told appellant he would kill Snow-Veley, but never intended to kill him. Jackson was in prison for an unrelated crime when Snow-Veley was killed.

{¶ 60} D'Antje Colvin testified she dated Snow-Veley for about two weeks in 2012, but stayed friends with him and in contact with him until he was murdered. Snow-Veley told D'Antje that the house on Grand belonged to him because appellant owed Snow-Veley money for some things Snow-Veley had done for appellant. Snow-Veley told D'Antje that he set the house on Grand on fire for appellant and appellant had Snow-

Veley kill Montelle for the insurance money. D'Antje told no one about this conversation until Detective Jeff Clark came to her house after Snow-Veley's body was found, then she told the detective.

{¶ 61} Appellant testified he was at his home at 1338 Grand on the evening of June 9, 2011, watching over Montelle because Montelle was on house arrest and was not supposed to leave. Appellant described Montelle as easily misled. Appellant left Montelle at the house and went to Toledo Hospital, arriving at about 1:00 a.m., because appellant "couldn't pass anything." After he saw the doctor, appellant learned Montelle's mother was at the hospital. About a half an hour later, appellant saw Montelle's mother and a nurse informed them that Montelle had passed away. It was about 2:15 or 3:00 a.m. Detective Kutz then came into the room and talked to appellant.

{¶ 62} Appellant saw Montelle's grandmother at the hospital but said he did not have a relationship with her. Appellant insisted his brother was lying when Witcher said appellant called about 1:00 or 1:30 a.m. to say that Montelle had died.

{¶ 63} Appellant left the hospital and went to Mary Taylor's house on Clay Street to inform her of Montelle's death. Although appellant was given some medication while at the hospital to take for his symptoms, he did not take the medication because he "never got a chance to." Appellant stayed at Mary's house until the next morning, then Ankney drove him out to see Snow-Veley at Williams' apartment. Appellant had to tell Snow-Veley about Montelle's death because Snow-Veley did not have a cellphone. There were

a lot of stolen televisions at Williams' apartment, which Snow-Veley had taken "earlier that night."

{¶ 64} Appellant explained he took an attorney with him to meet with police because Detective Clark "had put another false charge on me, the same allegations that he did with - - with Michael [III]." Appellant did not find out Montelle said that Snow-Veley shot him until appellant was charged with this crime and received the reports.

{¶ 65} Appellant testified most of the life insurance policies on Montelle had lapsed and one claim was denied because Montelle had been incarcerated. Appellant did not ask for any of the $80,000 that Tenille received from Montelle's life insurance policies. Appellant did not collect any money from any life insurance on Montelle.

{¶ 66} Appellant maintains he did not hire, attempt to hire or promise to pay either Snow-Veley or Christian Jackson to shoot and kill Montelle. Appellant was a little angry that Snow-Veley was telling people that he shot Montelle.

{¶ 67} Appellant acknowledged he did want to bond Michael III out of jail after he was arrested. Early on, appellant posted Michael III's bond and he was released from jail. Then, Detective Clark was "writing up all types of lies" and "put a false [aggravated menacing] charge" on Michael III to take him off of the street. As a result, Michael III's bond was revoked and raised, so he remained in jail. Appellant said it was Montelle, not Michael III, who had committed the aggravated menacing by threatening the Overtons with a fake gun. Appellant made a police report that Montelle committed the crime. Appellant paid a lawyer $3,500 to prove the aggravated menacing charges against

20.

Michael III were false. Appellant hoped the judge would see the allegations against Michael III were false, the bond would be lowered and Michael III would be let out of jail. Michael III's bond was never lowered.

{¶ 68} Appellant described what happened in the neighborhood on Grand: "[e]ight houses [were] fire bombed, * * * I had two Cadillacs fire bombed. Two - - two vans fire bombed. My girlfriend's car fire bombed. * * * My house been shot up many times."

{¶ 69} A review of the record shows the state alleged appellant had Montelle killed for life insurance proceeds so that appellant would have funds to pay for Michael III's defense and get Michael III out of jail. The state presented the following evidence in support of its allegations: appellant took out numerous life insurance policies on Montelle; appellant made a police report that Montelle committed aggravated menacing rather than Michael III; appellant paid a lawyer to prove the aggravated menacing charges against Michael III were false; appellant and Mary Taylor fought because appellant was spending so much time and money on Michael III's murder case; surveillance video showed Montelle, Snow-Veley and Jackson walking together before the shooting then Snow-Veley and Jackson running away after the shooting; Jackson identified himself, Snow-Veley and Montelle in the video; Ashely Smith recognized Snow-Veley as he ran away from Auburn and Bancroft; appellant gave himself an alibi at the time of Montelle's shooting by going to the hospital; appellant did not take any of the medicine prescribed by the doctor at the hospital; appellant told his brother about

21.

Montelle's death before the time that the nurse informed appellant of Montelle's death; after Montelle's death, appellant was taken out to where Snow-Veley and Jackson were located; Snow-Veley was like a son to appellant and appellant loved Jackson; appellant did not appear distraught after Montelle's death; and, appellant would not talk to police about Montelle's death without a lawyer.

{¶ 70} We find appellant's conviction for aggravated murder of Montelle Taylor is not against the manifest weight of the evidence. We cannot say the evidence weighs heavily against a conviction, that the jury lost its way, or a miscarriage of justice has occurred. Accordingly, appellant's second assignment of error is not well-taken as to appellant's conviction for aggravated murder of Montelle Taylor.

### Snow-Veley's Murder

{¶ 71} Appellant argues most of the state's case against him rests on his brother's testimony. Appellant claims Witcher said at least 16 shots were fired in the basement of the house, but no one else heard gunshots or smelled gunpowder or noticed Witcher nailing carpet to the steps. Appellant contends the testimony regarding the moving of Snow-Veley's body is like a scene from a television drama. Appellant observes no forensic evidence was found linking appellant to Snow-Veley's murder.

{¶ 72} In addition to the foregoing evidence, the following evidence with respect to Snow-Veley's murder was presented at trial.

{¶ 73} Witcher testified he had been living in the basement of appellant's home at 263 East Hudson since early 2013. Also living at the house at that time were appellant,

22.

Mary Taylor, Mary's children, Snow-Veley and Ratchet. During the Memorial Day party, Witcher played loud music from the basement of the home while most of the party's attendees remained on the upper level and outside of the house. Snow-Veley wanted money so appellant told Snow-Veley to come over.

{¶ 74} Witcher testified while appellant and Witcher were in the basement bagging up marijuana and Snow-Veley was rolling marijuana, appellant instructed Witcher to begin laying carpet on the steps so if "[a]nything else go wrong there would not have been no blood trail on the steps." Witcher then witnessed appellant place a sweet potato on a revolver. As Witcher was nailing carpet to the steps, he heard appellant shoot Snow-Veley. Snow-Veley was shot in the back of the head but was still alive. Snow-Veley and appellant fought and Witcher broke them up. Appellant shot Snow-Veley again. By then, Snow-Veley was on a loveseat in the basement; appellant again shot Snow-Veley, this time in the back.

{¶ 75} Witcher testified Ratchet came downstairs to the basement and asked appellant for a gun. Appellant gave Ratchet an automatic gun and Ratchet shot Snow-Veley twice in the back of the head, killing him. Afterwards, appellant and Ratchet sat Snow-Veley's body in a director's chair and placed it in the shower. The carpet and loveseat cushions were thrown in the trash.

{¶ 76} Witcher testified after the party ended, appellant and Ratchet used a wheelchair to transport Snow-Veley's body from the basement of appellant's home to an abandoned house across the street, securing the body to the chair with bungee cords,

23.

where they dumped the body in the garage. Witcher then witnessed appellant and Ratchet move the body from the abandoned garage and transport it to another abandoned house on Streicher Street. The body was thrown in the basement.

{¶ 77} There were six life insurance policies taken out on Snow-Veley from August 20, 2011 to April 15, 2013, worth a combined total of $460,000. Among the named beneficiaries of these policies were Tenille Galloway, who was listed as Snow-Veley's mother, and Sidney, who was listed as Snow-Veley's sister.

{¶ 78} Tenille testified that although she and her daughter were listed as beneficiaries on Snow-Veley's life insurance policies, neither she nor Sidney had any familial relationship to Snow-Veley. Tenille never applied to take out a life insurance policy on Snow-Veley, nor did her 8 or 9-year-old daughter apply for a life insurance policy on Snow-Veley. Tenille recognized appellant's phone number on several of the applications for life insurance on Snow-Veley. In addition, Tenille's address was listed on an application for life insurance on Snow-Veley, but Snow-Veley had never lived at her address.

{¶ 79} After Snow-Veley's body was discovered, Tenille learned from appellant that she was named as a contingent beneficiary on a life insurance policy on Snow-Veley, but she did not authorize that policy. Tenille wrote a letter to the life insurance company and instructed the company to remove her name from the life insurance policy on Snow-Veley because she "didn't want anything to do with insurance money that could have been blood money basically."

24.

**{¶ 80}** Mary Taylor testified at some point after Montelle was killed, Snow-Veley went to prison and when he got out, Snow-Veley "went back on Grand Street" which the neighborhood guys "kind of used * * * as a whore house." Mary testified Snow-Veley also came to live with her at the house on Hudson. Also living at the house on Hudson were appellant, Mary's seven children, Ratchet and Witcher.

**{¶ 81}** Mary testified about the 2013 Memorial Day get-together at the Hudson house. About 30 family and friends were at the gathering. Mary cooked "a Mexican fiesta, homemade tortillas things of that nature." When asked if appellant cooked, Mary said no and laughed. She explained she was laughing because he cannot cook. When asked if he did anything to help her cook, Mary said, "[i]f taking out the trash counts as cooking." While Mary was in the kitchen preparing the food, appellant was upstairs watching TV. Loud music was playing in the house. The neighbor, Joy, was washing clothes in Mary's basement because Joy's washer was broken. Joy lived two doors down the street from Mary. Throughout the day, Joy was back and forth between her own house and Mary's house doing four or five loads of laundry.

**{¶ 82}** Mary testified at one point, she and her children went over to Joy's house for an hour or two to get on the computer and play games. When Mary and the children left their house, appellant, Witcher, Snow-Veley and Ratchet were in the basement and Zahara, Mary's "daughter which is also Michael's sister," was on the front porch smoking marijuana.

25.

{¶ 83} Mary testified she was called back to her house by Joy's niece because Zahara and Ratchet had been in a car accident. Ratchet had been driving Zahara in Snow-Veley's girlfriend's car and wrecked it, but was able to drive the car back to Mary's house. Ratchet and Zahara came into Mary's house, but Snow-Veley was not with them. Mary did not understand why Ratchet was driving the car, and Joy's niece said Snow-Veley had left. Mary waited up for Snow-Veley thinking "there is going to be fireworks" when he gets home. About midnight or one in the morning, Mary went to bed.

{¶ 84} The next morning when Mary woke up, the wrecked car was gone so she thought Snow-Veley had come home. Mary was told Snow-Veley did not come home, so Mary's children called around to see where he was. The girl who owned the car had Snow-Veley's phone and had called all of the numbers in the phone. No one could locate Snow-Veley, so the police were called.

{¶ 85} Mary said Snow-Veley had a lot of enemies and had been shot when he was younger, about 15 years old. To make money, Snow-Veley would break into houses.

{¶ 86} Appellant testified there was a big party at the house on Hudson on Memorial Day 2013. He said Mary would not let anyone go upstairs, so "[p]eople [were] just going back and forth from the basement" to use the bathroom. Appellant also said Joy washed clothes all night long. He then said "[s]he was sending her 14-year old kids over to the house picking up clothes, washing them, putting more inside the dryer."

26.

**{¶ 87}** Appellant said Snow-Veley had spent the night at his girlfriend's house so he did not arrive at appellant's house until 3:00 or 3:30 p.m. Snow-Veley had driven to appellant's house in his girlfriend's car.

**{¶ 88}** Appellant testified he was in the kitchen cooking when Snow-Veley came up from the basement. Appellant and Snow-Veley were talking about Snow-Veley's upcoming court date. Snow-Veley was worried and wanted to leave his girl some money. Appellant was carrying a plate of noodles next door to Joy's house when he saw Snow-Veley "walking from the side going past the front yard getting inside the car." Snow-Veley said to appellant "if you can, why don't you droop me some Rillos and something else." Appellant would never see Snow-Veley again.

**{¶ 89}** When appellant came home from Joy's house, he told Zahara and Ratchet to go get what Snow-Veley had asked for. Zahara and Ratchet left and were gone for about 40 minutes. When they came home, "the car was crashed."

**{¶ 90}** The next day, appellant became aware that Snow-Veley was missing when Snow-Veley's "girlfriend showed up and we just -- and we - they pretty much exhausted all possibility of knowing where he was at."

**{¶ 91}** In one of the taped interviews with police, appellant told the detectives that he was cooking pretty much most of the day for the Memorial Day party. Also in a police interview, appellant told detectives he was not out of Joy's sight for more than five minutes on Memorial Day.

27.

**{¶ 92}** A review of the record shows the state alleged appellant killed Snow-Veley because Snow-Veley was "running his mouth" about killing Montelle and complaining about not being paid. The state presented the following evidence in support of its allegations: appellant took out numerous life insurance policies on Snow-Veley; appellant solicited Christian Jackson to kill Snow-Veley and gave Jackson a gun; appellant told police he was cooking for the Memorial Day party while Mary Taylor testified she cooked for the party and appellant does not cook; appellant said he was not out of Joy's sight for more than five minutes while Mary testified she and her children were over at Joy's on the computer and playing games for an hour or two; Ratchet was driving Snow-Veley's girlfriend's car; Witcher testified about Snow-Veley's murder and the relocation of the body afterwards; and, Tenille testified about the life insurance policies on Snow-Veley.

**{¶ 93}** Upon a review of all of the evidence in the record, we find the jury, as the trier of fact, did not lose its way in evaluating the evidence and drawing inferences from the evidence presented. The jury found the testimony of the state's witness was credible while appellant's testimony was not credible. The jury's conclusion is not unreasonable. Therefore, we find appellant's conviction for the aggravated murder of Christian Snow-Veley is not contrary to the manifest weight of the evidence. Accordingly, appellant's second assignment of error is not well-taken as to his conviction for the aggravated murder of Christian Snow-Veley.

28.

**{¶ 94}** Having found the trial court did not commit error prejudicial to appellant, the judgment of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, appellant is hereby ordered to pay the court costs incurred on appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                                         _____
                                                                                        JUDGE

Stephen A. Yarbrough, J.

                                                                   _____
James D. Jensen, P.J.                                             JUDGE
CONCUR.

                                                                   _____
                                                                                        JUDGE