[Cite as *State v. Wright*, 2022-Ohio-1537.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-20-1206

       Appellee                               Trial Court No.  CR0201902202

v.

Justin Wright                                   **DECISION AND JUDGMENT**

       Appellant                              Decided:  May 6, 2022

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**OSOWIK, J.**

## I.Introduction

{¶ 1} Appellant, Justin Wright, appeals the judgment of the Lucas County Court of

Common Pleas, sentencing him to a total of 50 years to life in prison following a jury

trial at which he was found guilty of one count of aggravated murder, felony murder, aggravated robbery, and aggravated burglary. For the foregoing reasons, we reverse, in part, and affirm, in part.

## A.    Facts and Procedural Background

{¶ 2} On July 11, 2019, appellant was indicted in case No. CR19-2202 on one count of aggravated murder in violation of R.C. 2903.01(B), an unspecified felony, one count of murder in violation of R.C. 2903.02(B) and 2929.02, an unspecified felony, one count of aggravated robbery in violation of R.C. 2911.01(A)(1) and (C), a felony of the first degree, and one count of aggravated burglary in violation of R.C. 2911.11(A)(2) and (B), a felony of the first degree. Each of the foregoing counts included a firearm specification under R.C. 2941.145. These charges stemmed from a shooting that took place at an apartment located at 1324 Ironwood Avenue, Toledo, on July 6, 2019. Tragically, one of the residents of the apartment, Tyler Carr, was killed during the shooting. Three other individuals associated with appellant, Dominique Roberts, Adrian Eaton, and Darion Martin, were also at the scene of the murder and indicted on the same charges.

{¶ 3} On July 18, 2019, appellant was indicted in case No. CR19-2244 on one count of improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B) and (I), a felony of the fourth degree, and one count of having weapons while under disability in violation of R.C. 2923.13(A)(2) and (B), a felony of the third degree. These

2.

charges resulted from law enforcement's discovery of appellant in possession of a loaded firearm that he was carrying in his vehicle at the time of a traffic stop on April 22, 2019. Appellant ultimately pled no contest to the charge of improperly handling firearms in a motor vehicle in exchange for the state's dismissal of the charge of having weapons while under disability. He was found guilty of improperly handling firearms in a motor vehicle and sentenced to 17 months in prison, to be served concurrently to the sentence the court imposed in case No. CR19-2202. Appellant does not challenge the disposition of case No. CR19-2244 in this appeal.

{¶ 4} On July 31, 2019, appellant appeared before the trial court for arraignment in case No. CR19-2202. He entered a plea of not guilty to the charged offenses and the matter proceeded through pretrial motion practice and discovery. On October 21, 2019, appellant filed a "Motion to Join in Co-Defendant's Motion to Suppress Identification." In his motion, appellant argued that law enforcement improperly administered an unduly suggestive photo array to Carr's friend and roommate, David Zeller, resulting in Zeller's identification of appellant as the shooter.

{¶ 5} On November 19, 2019, the matter proceeded to a hearing on appellant's motion to suppress. At the outset of the hearing, appellant's trial counsel addressed speedy trial concerns, and acknowledged that appellant was not entitled to receive credit for confinement under the triple count provisions of the speedy trial statute because, although he was being confined while he awaited trial, he was charged under two

3.

separate cases for unrelated charges. Thereafter, appellant voiced his disagreement with his counsel's concession, and the matter proceeded to a hearing on the motion to suppress.

{¶ 6} During the hearing, appellant called the two Toledo Police Department detectives that were assigned to investigate the shooting at issue in this case, namely Matthew Kozlaker and Danielle Mooney. For its part, the state called Zeller. Upon hearing the testimony provided by these witnesses and the arguments of the parties, the trial court agreed with appellant that the photo array was improperly administered, granted the motion to suppress, and excluded Zeller's identification from the record.

{¶ 7} Thereafter, on January 3, 2020, appellant filed a motion to dismiss, in which he asserted his constitutional right to a speedy trial and argued that he was not brought to trial within the appropriate timeframe under R.C. 2945.71. Appellant asserted that he was continuously held in jail following his arrest on July 8, 2019, and was therefore entitled to the triple count provision set forth in R.C. 2945.71(E). As such, appellant contended that the 270-day time period specified in R.C. 2945.71 had elapsed and he was entitled to dismissal of the indictment.

{¶ 8} In response, the state argued that appellant was not eligible under the triple count provision of R.C. 2945.71(E) after July 18, 2019, the date the state filed the indictment in case No. CR19-2244, because he was being held under two unrelated indictments from that point forward. Urging that the two cases did not arise from the

4.

same criminal incident or share a common litigation history, the state asserted that the triple count provision was inapplicable. Furthermore, the state noted "numerous tolling events" and argued that the statutory time period had not yet elapsed when those events were taken into consideration.

{¶ 9} Upon consideration of the parties' arguments, the trial court issued its decision denying appellant's motion to dismiss on February 7, 2020. In its decision, the trial court agreed with the state and found that appellant "faces two separate and unrelated criminal cases, with charges having no factual or temporal relationship with each other." Thus, the trial court held that the triple count provision of R.C. 2945.71 did not apply. Further, the court determined that the 270-day time period had not elapsed once tolling events were taken into consideration.

{¶ 10} While appellant's motion to dismiss was pending, on January 31, 2020, appellant filed a second motion to suppress. In his second motion, appellant argued that statements he made to law enforcement during questioning on July 9, 2019, should be suppressed because he was too intoxicated at the time he made them to understand and waive his *Miranda* rights. In response, the state noted that appellant was informed of his *Miranda* rights prior to questioning and executed a signed waiver of those rights, and urged that appellant was not too intoxicated to understand the rights he was waiving prior to making his statements.

5.

{¶ 11} The trial court held a hearing on appellant's second motion to suppress on February 21, 2020, at which appellant presented the video recording of his interview with Mooney and Kozlaker to substantiate his claim that he was too intoxicated to waive his *Miranda* rights. For its part, the state called Mooney and Kozlaker to testify at the hearing.

{¶ 12} Mooney and Kozlaker each testified that appellant did not appear to be intoxicated or under the influence of any illicit drugs at the time of his post-arrest interview. They went on to indicate that appellant's eyes were neither bloodshot nor glassy, his speech was not slurred, and they did not detect an odor of alcohol or marijuana on his person. Moreover, Mooney testified that appellant's motor functions were unimpaired and his responses to questioning were appropriate. Therefore, the notion that appellant might have been intoxicated during the interview "never occurred to [Mooney]." Moreover, Kozlaker testified that appellant "appeared normal to me."

{¶ 13} At the conclusion of the foregoing testimony, the trial court took the matter under advisement. Three days later, the trial court issued its decision on appellant's second motion to suppress, in which the trial court reviewed the testimony presented by Mooney and Kozlaker as well as the video recording of the interview, and found no indication that appellant was suffering any sort of impairment "of the type and gravity which would call into question his ability to reason." Thus, the trial court denied appellant's motion.

6.

{¶ 14} Following the trial court's denial of appellant's second motion to suppress, the matter continued through discovery and motion practice. On September 3, 2020, appellant filed a second motion to dismiss in which he reasserted his speedy trial rights and argued that such rights had been violated by the state's failure to bring him to trial within 270 days of his arrest. He recounted the procedural history of this case up to that point, and asserted that the time period of his confinement, after accounting for tolling events, was 297 days.

{¶ 15} Five days later, the state filed its response, in which it advanced its own understanding of the procedural history of the case and the tolling events that took place since appellant's arrest. The state accounted for the tolling events it identified and credited appellant with 9 days under the triple count provision of R.C. 2945.71 for the time period from his arrest on July 8, 2019, until the date of appellant's first request for a continuance on July 17, 2019. According to the state's calculations, appellant's speedy trial time period would expire no earlier than January 10, 2021, and thus he was not entitled to dismissal on speedy trial grounds.

{¶ 16} The trial court issued its decision on appellant's second motion to dismiss on October 19, 2020. In its decision, the trial court agreed with the state and summarily denied appellant's motion. On the same day the trial court denied appellant's second motion to dismiss, the matter proceeded to a five-day jury trial.

7.

{¶ 17} The state called 16 witnesses at trial. As the state's first witness, it called officer Shawn Mohler of the Toledo Police Department. Mohler was one of the officers who was dispatched to Carr's apartment pursuant to a shots fired call that was received shortly after the shooting. Upon arrival, Mohler was approached by two individuals, one of whom had an apparent injury to his arm. Since the injury did not appear to be life-threatening, Mohler directed that individual toward his police cruiser. Thereafter, Mohler proceeded toward the main door of the apartment. Meanwhile, he could hear Carr's mother screaming for help from inside the apartment.

{¶ 18} Upon entering the apartment, Mohler observed Carr lying on a couch in the living room, gasping for air. Mohler noticed that Carr had been shot in the chest and abdomen. He initiated chest compressions and remained with Carr until paramedics arrived on the scene. He subsequently learned that Carr had a loaded revolver on his person, which he removed from the living room and placed onto the dining room table for safe keeping.

{¶ 19} As he went about the apartment to secure the scene, Mohler noticed several pieces of evidence, including five spent shell casings and an ammunition magazine, which he preserved for subsequent analysis by detectives within the Scientific Investigations Unit ("SIU"). Mohler also noticed bullet holes in the walls of the apartment, drug paraphernalia, drug scales, and a marijuana cigarette inside the

8.

apartment. Photographs of this evidence were subsequently taken and entered into the record at trial.

{¶ 20} After clearing the apartment, Mohler exited to the rear and went out to the alley that runs behind the building. Mohler then waited on the scene until detectives arrived to continue the investigation. While waiting, Mohler noticed several vehicles that were parked in the rear of the apartment. Behind one of the vehicles, an SUV, Mohler found a nine millimeter Taurus semi-automatic handgun lying on the ground. At the time, Mohler suspected that this handgun may have been involved in the shooting, since he had retrieved a magazine from inside the apartment and this firearm was missing its magazine. This firearm was later retrieved by the SIU and entered into evidence at trial.

{¶ 21} As its second witness, the state called SIU detective Kristi Eycke. Eycke was one of the detectives that arrived at Carr's apartment on the morning of the murder. During her ensuing investigation, Eycke took several photographs and drew a diagram of the layout of the apartment. These items were admitted into the record at trial and published to the jury without objection. They establish the location of the aforementioned spent shell casings (subsequently identified as nine millimeter casings), bullet holes, and ammunition magazine, as well as the presence of blood on a doorway inside the apartment and on the exterior side of the back door.

{¶ 22} Based upon her retrieval of spent shell casings in the living room and kitchen, Eycke was able to ascertain that whoever fired those shots did so from the living

9.

room and kitchen. Eycke went on to indicate that she discovered defects in the couch on which Carr was sitting that were consistent with bullet holes. She also found bullet fragments underneath the couch.

{¶ 23} In addition to the foregoing, Eycke testified that the revolver Mohler recovered from Carr's person was loaded with five rounds, all of which were unfired. Furthermore, the magazine recovered from the apartment was fully loaded with nine millimeter rounds.

{¶ 24} For its third witness, the state called Shayne Jackson. Jackson, an acquaintance of both Carr and appellant, was present at Carr's apartment on the morning of the shooting. According to Jackson, he went over to Carr's apartment with three other friends, Tom Wright, Israel Wright, and Joshua Taylor.[1] Jackson indicated that the group went over to Carr's apartment to "hang out."

{¶ 25} Upon arriving at the apartment, Jackson noticed that Carr and his roommate, David Zeller, were already inside. Jackson and his friends went into the living room and sat down. Meanwhile, Carr and Zeller were seated on the couch in the same room. The group proceeded to play video games, drink alcohol, and smoke marijuana together.

---

[1] Jackson testified that Tom Wright and Israel Wright are not related to appellant despite sharing the same last name.

10.

**{¶ 26}** Thirty minutes later, appellant and another individual arrived at the apartment. They came into the living room and sat down on the couch next to Zeller, and indicated that they were there to purchase marijuana from Carr. After completing the purchase, they remained in the living room. At some point, the group of individuals began to handle the firearms that were in the living room. Jackson picked one of the firearms up, prompting appellant's friend to voice his displeasure and ask Jackson to put the firearm back on the table. Jackson complied. At this point, appellant's friend picked up the firearm and proceeded to break the firing pin. According to Jackson, appellant was also holding a firearm at the time.

**{¶ 27}** Approximately one hour after appellant arrived at the apartment, another individual in possession of a firearm gained access to the apartment through the back door and entered the living room through the kitchen. This individual said "nobody move," and began pacing around the living room. Appellant's friend then began removing items from everyone's pockets. Jackson specified that appellant's friend stole his wallet and mobile phone. Meanwhile, appellant was standing in the room with a cocked firearm in his hand.

**{¶ 28}** Apparently frustrated that the group was not fully compliant, appellant asked if they thought he was playing a game. Thereafter, appellant fired a shot toward the living room wall. Panicked, the group attempted to flee toward the back door to exit

11.

the apartment. Appellant, his friend, and the intruder opened fire as the group tried to escape.

{¶ 29} Jackson and Israel ultimately fled the apartment and hid behind a nearby fence. Five minutes later, the two men returned to the apartment, at which time they discovered that Joshua had been shot.

{¶ 30} Police arrived shortly thereafter, and Jackson stayed to provide a statement to the officers who arrived on the scene. He also spoke with officers at the Toledo Safety Building, where he was shown a photo array and identified appellant as the shooter. Early in his testimony, Jackson stated that he knew appellant, having met him "a few weeks" prior to the shooting.

{¶ 31} Following Jackson's testimony, the state called detective Jeff Quigley for its fourth witness. During his brief testimony, Quigley indicated that he was the blind administrator who administered the photo array to Jackson. He testified that he administered the photo array in accordance with standard procedures and he verified that Jackson identified appellant as the shooter.

{¶ 32} As its fifth witness, the state called lieutenant Phil Cook of the Toledo Police Department. As a communications coordinator, Cook retrieved the recording of the 911 call that was made in this case. At trial, he authenticated the recording, which was then admitted into the record and published for the jury along with the incident report associated with the call.

12.

{¶ 33} For its sixth witness, the state called Dr. Jeffrey Hudson. Hudson works as a deputy coroner and forensic pathologist for the Lucas County Coroner's office. In this capacity, Hudson performed the autopsy on Carr and prepared a report detailing his findings from that autopsy, which was admitted into the record at trial. Upon examining Carr's body, Hudson discovered three wounds, which he described as entrance gunshot wounds. Hudson testified that he found such wounds on Carr's chest, abdomen, and left thigh. According to Hudson, the chest and abdomen gunshot wounds were fatal. Thus, Hudson testified that Carr died from multiple gunshot wounds.

{¶ 34} Hudson also identified a "partial exit wound" on Carr's right lower back where the projectile that entered at Carr's chest almost escaped. Hudson was able to retrieve two projectiles from Carr's right lower back, and he noted at trial that one of the projectiles was "very well-preseved. It's a jacketed bullet."

{¶ 35} Following Hudson's testimony, the state called David Cogan as its seventh witness. As the laboratory administrator at the Toledo Police Department's forensic laboratory, Cogan performs firearm examinations and drug analyses. After he was certified as an expert in the field of forensic firearm and projectile analysis, Cogan testified that he conducted a forensic examination of the shell casings recovered from Carr's residence following the shooting. In particular, Cogan examined two shell casings that were recovered from the kitchen and five shell casings that were recovered from the living room. Upon examination, he determined that the five shell casings from the living

13.

room were fired from the same firearm, which he subsequently identified as "the SCCY pistol." Further, Cogan determined that the two shell casings from the kitchen were each fired from the same firearm, but they were not fired from the SCCY firearm that fired the five shots from the living room. Cogan conducted a projectile analysis with the Taurus handgun recovered from the ground outside Carr's residence, but was not able to conclusively determine whether the two shell casings from the kitchen were fired with that firearm.

{¶ 36} The state called Martin, one of appellant's alleged co-conspirators, as its eighth witness. Martin testified that he had known appellant for two months at the time of the shooting. On the night of the shooting, Martin was with appellant at Dewey Edwards' apartment.[2] He and appellant decided to pick Eaton up from work at Cinco De Mayo restaurant in Holland. On the way to pick up Eaton, the group met up with Roberts, who went along with appellant and Martin to pick Eaton up. Thereafter, the four men went back to Edwards' apartment, stopping to drop off blankets to Roberts' daughter along the way.

{¶ 37} From Edwards' apartment, the four men used Edwards' vehicle to travel to East Toledo to go to Carr's residence. Martin was driving. Upon arriving, Martin parked

---

[2] Edwards lives in a duplex, which he owns. At the time of the shooting, Edwards lived in the downstairs unit and he rented the upstairs unit to appellant, who lived in the apartment with Eaton and Martin.

14.

in the alley behind the residence. Appellant and Eaton entered. Martin testified that he and Roberts remained in the vehicle while appellant and Eaton went inside. Five minutes later, appellant and Eaton returned and indicated they "wanted to party."

{¶ 38} Appellant indicated that he wanted to "get some pills." Consequently, the four men left Carr's residence, went to purchase drugs at a house on Arden Place, and stopped at a Sunoco gas station in East Toledo before returning to Carr's residence. At the gas station, appellant exited the vehicle and the others remained inside the vehicle. While the group was waiting for appellant to return, Martin overheard Roberts and Eaton discussing the idea of a robbery at Carr's residence.

{¶ 39} Upon returning to Carr's residence, appellant and Eaton entered. Again, Martin and Roberts initially remained in the vehicle. According to Martin, he and Roberts were smoking Black and Mild cigarettes and text messaging on their mobile phones. Martin was messaging his brother. In Martin's text messages, which were admitted into the record at trial, he informed his brother that he was "hitting a lick." Martin explained at trial that to "hit a lick is to rob someone, steal from someone, break in someone's stuff, stuff like that. Basically take from others."

{¶ 40} Approximately five to ten minutes after appellant and Eaton entered Carr's residence, Roberts exited the vehicle. He stood next to the car for a moment with his mobile phone in his hand. Martin glanced over at Roberts' phone and noticed a text message directing Roberts to "come in now" and informing him that there were six

15.

people inside.  Thereafter, Roberts entered the residence.  Martin testified that Roberts was carrying a firearm when he entered the residence.

{¶ 41} Martin stated that he heard gunshots coming from inside the residence within minutes of Roberts entering.  He then witnessed "four people run out the house, out the alley and then Adrian Eaton, Dominique Roberts, * * * and Justin Wright came outside the house."  At this point, Martin noticed that Wright was helping Roberts to the vehicle and Eaton was running toward the vehicle.  Once the three men were inside the vehicle, Martin drove away.  The vehicle ran out of fuel and stalled as the group was driving over the Craig Street Bridge toward the downtown area.

{¶ 42} After the vehicle stalled, the four men exited the vehicle.  Martin testified that he walked across the bridge, heading toward downtown.  Appellant and Eaton followed him, but Roberts walked in the opposite direction, toward East Toledo.

{¶ 43} While walking across the bridge, Martin called 911 to report that Roberts had been shot.  Thereafter, appellant asked Martin to call Edwards.  After he had Edwards on the phone, Martin passed the phone to appellant, who asked Edwards to report that his vehicle was stolen.

{¶ 44} Once Martin, appellant, and Eaton were across the bridge, Edwards and his neighbor, Leonard Austin, arrived in Austin's black pickup truck to pick them up.  From there, the five men went to the Greenbelt Place apartments, where Edwards and Austin dropped off Martin, appellant, and Eaton.  Shortly thereafter, Martin decided to return to

16.

Edwards' apartment. He departed the Greenbelt Place apartments, leaving appellant and Eaton behind.

{¶ 45} Following Martin's testimony, the state called Edwards as its ninth witness. Edwards indicated that he had known appellant, Martin, and Eaton prior to the shooting in this case. He described appellant as "like my god-nephew" and indicated that appellant used to live with him. Edwards further explained that Martin lived in the upstairs apartment above his residence.

{¶ 46} On the afternoon of July 5, 2019, Edwards rode along with Eaton to Cinco de Mayo restaurant, where he dropped Eaton off and drove himself back home. Edwards was expecting to pick Eaton up from work at the end of Eaton's shift, but appellant and Martin offered to do so instead. According to Edwards, appellant and Martin left in his vehicle at around 9 p.m. Thereafter, Edwards took his medication, which makes him drowsy, and he fell asleep.

{¶ 47} Later in the evening, Edwards awoke to a phone call from appellant, who informed Edwards that his vehicle was stolen. Appellant directed Edwards to "call it in" and said he would call Edwards back. When appellant called Edwards again, he asked Edwards to come pick him up. Edwards agreed, woke Austin up, and departed from his residence with Austin. Eventually, Edwards picked up appellant, Martin, and Eaton on Bush Street in Toledo.

17.

{¶ 48} As its tenth trial witness, the state called Kozlaker to the stand. Kozlaker received information about the shooting in this case on July 6, 2019. He immediately responded to Carr's residence to investigate the matter. During the course of his investigation, Kozlaker discovered a blood stain on the rear seat of Edwards' vehicle. He retrieved a sample of the substance and submitted it to the Ohio Bureau of Criminal Investigations for further analysis. The DNA profile from the sample was determined a match with Roberts' DNA.

{¶ 49} For its eleventh witness, the state called officer Richard Eckel of the Toledo Police Department. Eckel and his partner were on duty on July 6, 2019, when they received a call from dispatch informing them of a shooting victim near the Craig Street Bridge. Because they were near that location, the officers responded to the scene, where they discovered Roberts holding his groin and exclaiming that he had been shot. Eckel investigated the area but was unable to locate any shell casings to substantiate Roberts' claim that he was shot in that area. Further, Eckel was unable to corroborate other statements made by Roberts as to how he was shot.

{¶ 50} Following Eckel's testimony, the state called officer Michelle Sterling of the Toledo Police Department for its twelfth witness. Sterling testified that she retrieved a bullet from St. Vincent's hospital on July 8, 2019. Sterling indicated that the bullet was recovered from Roberts' scrotum. After retrieving the bullet from the hospital, she took it to the Safety Building and booked it into evidence.

18.

{¶ 51} Thereafter, the state called sergeant William Shaner of the Toledo Police Department as its thirteenth witness. At approximately 5 p.m. on July 8, 2019, Shaner received a Crime Stopper tip regarding appellant, whom Shaner described as a "fugitive that I was actually going after that day and sitting on several locations trying to find him." The informant told Shaner that she was in communication with appellant, who was asking her to transport him out of town. The informant called back and notified Shaner that appellant was going to be meeting her at her apartment on North Ontario Street.

{¶ 52} Shaner proceeded to the address, found appellant hiding inside the bathroom of the apartment, and took appellant into custody. Soon thereafter, the informant called Shaner to notify him of a nine millimeter SCCY handgun and a mobile phone that she found inside her bathroom, which Shaner later retrieved.[3]

{¶ 53} As its fourteenth witness, the state called Zeller, who was present at the time of the shooting on July 6, 2019. Zeller testified as to the chain of events that transpired in Carr's residence on the morning of the shooting, largely corroborating Jackson's earlier testimony.

{¶ 54} Notably, Zeller testified that, approximately one-half hour after appellant returned to Carr's residence, "another gentleman showed up" with a firearm in hand and attempted to rob those present by ordering everyone to empty their pockets. Zeller

---

[3] Earlier in the trial, Edwards testified that he was the owner of the SCCY handgun, which he said was stolen from him.

19.

testified that appellant and his friend appeared to act in coordination with the robber. According to Zeller, appellant eventually stood up, pulled his handgun out of his left pocket, and shot Carr "maybe three or four" times. Zeller also saw the robber fire his weapon. The rest of the men in the room began to scatter following the shooting. During the ensuing chaos, Zeller "heard multiple gunshots. I dove to the ground. And as I [saw] everybody leaving the apartment, I stood up to help Tyler, * * * and then a few more shots came through the wall and that was it."

{¶ 55} For its fifteenth witness, the state called detective Martin Rocha of the Toledo Police department's scientific investigations unit. On July 8, 2019, Rocha received a request from Shaner to assist in the collection of evidence related to this case. Rocha proceeded to the informant's residence. When he entered the bathroom in which appellant was discovered and arrested, Rocha found a firearm and mobile phone lying atop the vanity. Rocha photographed the items as he found them, and then transported the items to the Toledo Safety Building for further analysis. Once at the Safety Building, Rocha checked the items for fingerprints (he found none), swabbed the items for DNA, and then booked them into evidence.

{¶ 56} After Rocha finished his testimony, the state called detective Ben Cousino of the Toledo Police department for its sixteenth witness. On July 6, 2019, Cousino responded to the Craig Street Bridge after he was informed that an abandoned vehicle located there may have been involved in the shooting that took place at Carr's residence.

20.

Upon arrival, Cousino photographed the interior and exterior of the vehicle, a silver Chevrolet Impala that was owned by Edwards. Cousino then retrieved a black ski mask from inside the vehicle. Additionally, Cousino discovered a black Cinco de Mayo Restaurant tee shirt on the ground near the vehicle, which he photographed and retrieved.

{¶ 57} From the Craig Street Bridge, Cousino traveled to an impound lot where one of the SUVs from Carr's residence was being held. Cousino testified that he processed the vehicle, including the blood found thereon, and then proceeded to Carr's residence. At the residence, Cousino took additional photographs and retrieved a projectile from behind the living room couch. Cousino located additional blood stains on a driveway at a neighboring residence. He then attended Carr's autopsy, at which he secured Carr's clothing and two projectiles that were recovered from Carr's body. Cousino left the autopsy and went back to the Craig Street Bridge after he was notified that a construction worker found a SCCY firearm magazine on the ground alongside the bridge in the vicinity of the abandoned vehicle. Cousino photographed the magazine and retrieved it, emptying the four rounds from the magazine as he secured it.

{¶ 58} Thereafter, Cousino returned to the impound lot and further processed the silver Chevrolet Impala. Cousino recovered a state identification card belonging to appellant from the vehicle. Additionally, Cousino discovered a plastic bag containing several nine millimeter cartridges inside the center console. He removed a portion of the rear seat that appeared to be stained with blood for further DNA analysis. Further,

21.

Cousino collected a fingerprint from the driver's door window. After analyzing the fingerprint, Cousino was able to determine that the fingerprint belonged to Martin.

{¶ 59} After calling the foregoing witnesses, the state recalled Kozlaker to the stand. While investigating the shooting at Carr's residence, Kozlaker spoke with appellant, who confessed to shooting Carr with the SCCY handgun. Further, Kozlaker reviewed text messages that were extracted from appellant's mobile phone. In these messages, appellant and Roberts discussed their plan to commit a robbery and shoot two of the men inside Carr's residence. Moments after the final text message was sent, Carr called 911 and informed the dispatcher that appellant shot him.

{¶ 60} Following Kozlaker's testimony, the state rested. Appellant then moved for an acquittal under Crim.R. 29. The trial court denied appellant's motion, and the matter proceeded to appellant's case-in-chief, during which appellant was the only witness.

{¶ 61} In his testimony, appellant acknowledged that he was present in Carr's residence at the time of the shooting. According to appellant, he was at the residence in order to "purchase one gun and trade another."

{¶ 62} When asked to describe his behavior during the moments leading up to the shooting, appellant testified: "I snort another line of coke off the table and I go to roll up another Backwoods. I have my head down so I can't really say for sure where or how it happened, but I heard multiple gunshots. And from where I'm sitting, it sounded like

22.

they were coming from the kitchen." After hearing the shots, appellant reportedly dropped to the floor, where he heard several more gunshots. He then stood up, grabbed his handgun from the coffee table, and started firing back in the direction of the kitchen.

{¶ 63} On cross examination, appellant stated: "I have never denied the fact that I shot Tyler." However, appellant insisted that the shooting was accidental and he was only trying to defend himself.

{¶ 64} At the conclusion of his testimony, appellant rested. Appellant then renewed his Crim.R. 29 motion, which was summarily denied. After the jury was instructed and the parties presented their closing statements, the jury retired for deliberations. Eventually, the jury found appellant guilty of aggravated murder, felony murder, aggravated robbery, and aggravated burglary, along with the firearm specifications that were attached to each charge.

{¶ 65} At sentencing, the state was asked to elect whether to proceed on the aggravated murder charge or the lesser included offense of felony murder. The state chose the former. Thereafter, the trial court sentenced appellant to 25 years to life in prison for aggravated murder, 8 years to 12 years for aggravated robbery, and 8 years to 12 years for aggravated burglary. The court then ordered those sentences to be served consecutively, and consecutive to each three-year sentence associated with the three attendant firearm specifications.

23.

**{¶ 66}** Following sentencing, appellant filed his timely notice of appeal. While the appeal was pending, the parties entered a joint "stipulated notice of conceded error" informing the court that the trial court's "judgment entry in this case does not include an aggregate minimum and maximum sentence as required by R.C. 2929.144(B)(2)."

## B. Assignments of Error

**{¶ 67}** On appeal, appellant assigns the following errors for our review:

I. The trial court abused its discretion when it denied Wright's motion to suppress statements.

II. The trial court abused its discretion when it allowed statements by a co-defendant as a hearsay exception.

III. The trial court abused its discretion when it denied Wright's motion for acquittal pursuant to Crim.R. 29 as to aggravated burglary.

IV. The trial court abused its discretion by failing to dismiss Wright's case on the basis of a speedy trial violation.

V. The trial court abused its discretion by failing to merge Wright's sentences on the basis of allied offenses of similar import, or in the alternative, by failing to order concurrent sentences to a sentence of 25 years to life.

**{¶ 68}** For ease of discussion, we will address appellant's assignments of error out of order.

24.

## II. Analysis

### A. Denial of Appellant's Motion to Suppress

{¶ 69} In appellant's first assignment of error, he argues that the trial court erred in denying his January 31, 2020 motion to suppress, in which he argued that the statements he made during an interview with Mooney and Kozlaker on July 9, 2019, should be suppressed because he was too intoxicated at the time he made them to understand and waive his *Miranda* rights.

{¶ 70} Our review of the trial court's denial of appellant's motion to suppress "presents a mixed question of law and fact." *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 40, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. We must accept the trial court's factual findings if they are supported by competent credible evidence, and "independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Wesson* at ¶ 40, quoting *Burnside* at ¶ 8.

{¶ 71} Prior to a custodial interrogation, the Fifth Amendment requires that a suspect "receive *Miranda* warnings to protect against self-incrimination." *Id.* at ¶ 34, citing *Miranda v. Arizona*, 384 U.S. 436, 478-479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Thus, statements obtained through a custodial interrogation that lacked the requisite *Miranda* safeguards are inadmissible at trial. *State v. Dailey*, 53 Ohio St.3d 88, 90, 559 N.E.2d 459 (1990), citing *Miranda* at 444.

25.

{¶ 72} Here, appellant acknowledges that he was notified of, and waived, his *Miranda* rights prior to speaking with Mooney and Kozlaker on July 9, 2019. However, he argues, as he did before the trial court, that he was too intoxicated at the time of the interview to enter into a knowing, voluntary, and intelligent waiver of his *Miranda* rights. As such, appellant contends that the waiver was invalid and his statements should have been suppressed.

{¶ 73} "An accused's signed waiver form is strong proof that such waiver was valid." *State v. Nields*, 93 Ohio St.3d 6, 14, 75, 752 N.E.2d 859 (2001), citing *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988); *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). "However, if a defendant challenges the validity of the waiver, the state bears the burden of demonstrating, by a preponderance of the evidence, that the waiver was knowingly, intelligently, and voluntarily made." *State v. Velliquette*, 2020-Ohio-4855, 160 N.E.3d 414, ¶ 19 (6th Dist.), citing *Wesson* at ¶ 34.

{¶ 74} The determination of whether a defendant's waiver satisfies the *Miranda* standard involves a two-step analysis:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned

26.

and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

{¶ 75} Appellant's argument on appeal does not challenge the first step – he does not contend that his statements were the product of police intimidation, coercion, or deception. Instead, appellant argues that he was unaware of the nature of his rights and the consequences of waiving those rights because he was intoxicated at the time of the waiver.

{¶ 76} To support his argument, appellant references the video recording of the interview that was admitted during the suppression hearing. Appellant claims the recording demonstrates his "deportment during most of the first part of the interview * * *, as well as his apparent excessive fatigue in the remainder of the interview." He specifically notes his difficulty in removing his jacket, crying and shaking during the first 30 minutes of the interview, and apparent fatigue as indicators of his intoxicated condition.

{¶ 77} At the suppression hearing below, the trial court observed the video recording of appellant's interview with Mooney and Kozlaker, and also heard testimony

27.

from Mooney and Kozlaker. Both officers stated that appellant did not appear to be intoxicated or under the influence of any illicit drugs at the time of the interview. They explained that appellant did not present with bloodshot or glassy eyes, did not smell of alcohol or marijuana, and spoke without slurring his speech. Further, Mooney testified that appellant responded appropriately to questioning. Based upon this evidence, the trial court found no merit to appellant's intoxication argument and found that there was no evidence of impairment sufficient to warrant suppression of appellant's statements.

{¶ 78} Upon our review of the record and consideration of the totality of the circumstances, we find that the video recording of the interview and the officers' testimony at the suppression hearing constitutes competent credible evidence that supports the trial court's factual findings concerning appellant's awareness at the time of his execution of the written *Miranda* waiver. The observations provided by Mooney and Kozlaker at the suppression hearing are confirmed by the video, in which appellant does not look as though he is intoxicated at the time of the interview. Appellant appears to be in control of his mental faculties and fully aware of the nature of the rights he was waiving and the consequences of that waiver.

{¶ 79} In his brief, appellant states: "When asked if he is ok, [appellant] shakes his head 'no.'" Appellant interprets this response as indicative of intoxication, but the response actually belies appellant's appreciation of the gravity of the charges he is facing and his awareness of the proceedings.

28.

{¶ 80} In light of the video evidence and testimony of Mooney and Kozlaker presented at the suppression hearing, we find that the state met its burden of demonstrating that appellant's waiver of his *Miranda* rights was knowing, voluntary, and intelligent. Therefore, we do not find that the trial court erred in denying appellant's motion to suppress. Appellant's first assignment of error is not well-taken.

### B. Denial of Appellant's Speedy Trial Argument

{¶ 81} In his fourth assignment of error, appellant argues that the trial court abused its discretion in denying his motion to dismiss on speedy trial grounds.

{¶ 82} The right to a speedy trial is guaranteed by the United States and Ohio Constitutions. *State v. Adams*, 43 Ohio St.3d 67, 68, 538 N.E.2d 1025 (1989). "In reviewing a denial of a motion to dismiss based on an appellant's right to a speedy trial, we apply a de novo standard of review." *State v. Smith*, 6th Dist. Lucas No. L-14-1224, 2016-Ohio-150, ¶ 7, citing *State v. Browand*, 9th Dist. Lorain No. 06CA009053, 2007-Ohio-4342, ¶ 10.

{¶ 83} Ohio's speedy trial protections are set forth in R.C. 2945.71. Under R.C. 2945.71(C)(2), a defendant who is charged with a felony must be brought to trial within 270 days of his arrest. Further, under the "triple count provision" set forth in R.C. 2945.71(E), each day an accused is held in custody in lieu of bail on the pending charge counts as three days for purposes of computing the speedy trial timeframe.

29.

**{¶ 84}** As a preliminary matter, we will address whether, and to what extent, the triple count provision of R.C. 2945.71(E) applies in this case. Appellant was held in custody while he awaited trial. However, appellant was not held in custody *solely* on the charges in this case. Indeed, appellant acknowledges that he was arrested and confined on both the charges in this case and also firearms-related charges that "were undisputedly separate matters" in case No. CR19-2244.

**{¶ 85}** The triple-count provision applies "only to those defendants held in jail in lieu of bail solely on the pending charge." *State v. MacDonald*, 48 Ohio St.2d 66 (1976), paragraph one of the syllabus. "Thus, when a defendant awaits trial on separate unrelated cases, the triple-count provision does not apply." *State v. Sydnor*, 4th Dist. Scioto No. 10CA3359, 2011-Ohio-3922, ¶ 19, citing *State v. Ladd*, 56 Ohio St.2d 197, 203, 383 N.E.2d 579 (1978).

**{¶ 86}** Appellant argues that the triple count provision should apply in this case because the state arraigned him on both the present charges and the firearms charges on the same day, the cases proceeded together through litigation, and the trial court sentenced him as to both sets of charges on the same day. While it may be true that the two cases share a common litigation history, there is nothing in the record to demonstrate that the charges in the present action, which arose from the shooting at Carr's residence on July 6, 2019, were in any way related to the firearms charges that arose from law

30.

enforcement's discovery of a loaded firearm that appellant was carrying in his vehicle at the time of a traffic stop on April 22, 2019.

{¶ 87} Notwithstanding the purported shared litigation history of appellant's two cases, the triple count provision does not apply here because the cases relate to different criminal incidents. *Sydnor* at ¶ 23. As stated succinctly by the court in *Sydnor*, "This is not a situation where multiple charges arise from a single criminal incident and share a common litigation history. Therefore, the triple-count provision does not apply." *Id.* at ¶ 26.

{¶ 88} Having found that the triple count provision is largely inapplicable in this case (except as stated in the following paragraph), we will proceed to consider whether appellant was brought to trial within the 270-day time period set forth in R.C. 2945.71(C)(2).

{¶ 89} Appellant was arrested and held in custody on the present charges on July 8, 2019. Nine days later, appellant requested a continuance of his arraignment, which tolled the speedy trial clock. While awaiting arraignment, on July 18, 2019, appellant was indicted in case No. CR19-2244. Thus, the triple count provision applies to the first nine days of appellant's pretrial confinement, leaving 243 days remaining on the clock. Under R.C. 2945.72, the speedy trial clock may be extended for several reasons, some of which are applicable here as set forth below.

31.

{¶ 90} Between appellant's arraignment and the start of trial, several tolling events occurred. The first such tolling event took place when appellant submitted a request for discovery on the day he was arraigned, July 31, 2019. This request tolled the clock until the state responded to the request on August 13, 2019, a total of 13 days. *See State v. Pacheco*, 6th Dist. Wood No. WD-10-003, 2011-Ohio-3117, ¶ 9, citing *State v. Brown*, 98 Ohio St.3d 121, 2002-Ohio-7040, 781 N.E.2d 159, syllabus (noting that an accused's demand for discovery or a bill of particulars is a tolling event pursuant to R.C. 2945.72(E)).

{¶ 91} Thereafter, on October 21, 2019, appellant filed his first motion to suppress. "The time period within which a defendant must be brought to trial is tolled from the day of the filing of a motion to suppress until the day the trial court rules on the motion, pursuant to R.C. 2945.72(E), provided that the trial court rules within a reasonable period of time." *State v. Beaver*, 6th Dist. Ottawa No. 93OT001, 1993 WL 551550, *3 (Dec. 17, 1993), citing *State v. Arrizola*, 79 Ohio Spp.3d 72, 606 N.E.2d 1020 (3d Dist.1992). The trial court ruled within a reasonable period of time, denying appellant's motion on November 25, 2019, for a total tolling period of 35 days. On that same day, appellant filed a supplemental discovery request, which tolled the clock until the state responded 23 days later on December 18, 2019.

{¶ 92} On January 3, 2020, appellant filed a motion to dismiss on speedy trial grounds. While the motion was pending, appellant filed his second motion to suppress.

32.

The motion to dismiss was denied on February 7, 2020, and the motion to suppress was denied on February 24, 2020. The total tolling period attributable to these motions was 52 days. *See State v. Waite*, 6th Dist. Ottawa No. OT-04-051, 2005-Ohio-4440, ¶ 26 ("In addition to discovery demands, a motion to dismiss alleging a violation of a defendant's right to a speedy trial will also toll the time in which a defendant must be brought to trial.").

{¶ 93} On March 27, 2020, in response to the coronavirus pandemic, the General Assembly tolled all statutory time limitations in criminal cases set to expire between March 9, 2020 and July 30, 2020. *See* 2020 Am. Sub. H.B. 197, Section 22(A)(3),(10),(B),(C) (tolling retroactive to March 9, 2020, which shall last until the sooner of July 30, 2020 or the expiration of the declaration of emergency in the Executive Order 2020-01D). Because the emergency declared by the governor lasted longer than the longest end date in the act, the expiration date for tolling under the emergency act was July 30, 2020.

{¶ 94} In *In re Disqualification of Fleegle*, 161 Ohio St.3d 1263, 2020-Ohio-5636, 163 N.E.3d 609, the Ohio Supreme Court stated the following concerning the reasonableness of continuing cases due to the pandemic:

And as all Ohio judges have been advised, trial judges have the authority to continue trials for defendants on a case-by-case basis without violating speedy-trial requirements. The Ohio Attorney General has opined that

33.

courts may suspend jury trials to prevent the spread of the coronavirus and they may do so consistent with state and federal speedy-trial obligations. 2020 Ohio Atty. Gen. Ops. No. 2020-002. Specifically, R.C. 2945.72(H) provides that speedy-trial time may be extended by "the period of any reasonable continuance granted other than upon the accused's own motion"; continuing a trial because of a pandemic state of emergency is "reasonable."

*Id.* at ¶ 7.

{¶ 95} Likewise, we have held that delays associated with the coronavirus pandemic toll the speedy trial clock. *See State v. Wright*, 6th Dist. Lucas No. L-21-1101, 2022-Ohio-143, ¶ 37 ("Pursuant to R.C. 2945.72(H), [*State v. McCorkle*], 2d Dist. Greene No. 2020-CA-36, 2021-Ohio-2604, and 2020 Ohio Atty.Gen.Ops. No. 2020-002, we find the pandemic emergency is a reasonable basis for a continuance. Therefore, the clock is stopped."). Thus, the speedy trial clock was tolled for another 143 days.

{¶ 96} Thereafter, on September 3, 2020, appellant filed his second motion to dismiss, again tolling the speedy trial clock until the trial court denied the motion 46 days later on October 19, 2020. The jury trial in this matter commenced on the same day the trial court denied appellant's second motion to dismiss.

{¶ 97} In total, 467 days elapsed between appellant's arrest on July 8, 2019, and the commencement of trial on October 19, 2020. Because nine of those days qualify

34.

under the triple count provision, a total of 485 days are countable for purposes of evaluating speedy trial compliance. Based upon our calculations, the sum of the aforementioned tolling periods equals 312 days. After accounting for these tolling periods, only 155 days elapsed before appellant was brought to trial. As noted above, appellant was required to be brought to trial within 270 days of his arrest under R.C. 2945.71(C)(2). Since appellant was brought to trial within that time period, we find no merit to his speedy trial argument, and we conclude that the trial court properly denied his motion to dismiss.

{¶ 98} Accordingly, appellant's fourth assignment of error is not well-taken.

### C. Admission of Evidence as Hearsay Exception

{¶ 99} In appellant's second assignment of error, he asserts that the trial court abused its discretion in allowing Martin to testify, over his objection, concerning a conversation between Eaton and Roberts at the gas station. Specifically, appellant argues that such testimony constituted inadmissible hearsay that should have been excluded.

{¶ 100} Although the trial court generally has broad discretion regarding the admissibility of evidence, such discretion must be "exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). Indeed, "[w]hile there is discretion to admit or exclude relevant evidence, there is no 'discretion' to admit hearsay." *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 29 (6th Dist.). As such, we have stated that "[a]n appellate

35.

court applies a de novo standard of review to a trial court's decision regarding whether evidence is hearsay or non-hearsay under Evid.R. 801." *XPX Armor & Equip., Inc., v. SkyLIFE Co., Inc.*, 2020-Ohio-4498, 158 N.E.3d 1024, ¶ 97 (6th Dist.).

{¶ 101} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Notably, admissions by a party opponent are specifically excluded from the definition of hearsay pursuant to Evid.R. 801(D)(2), and such admissions include "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." Evid.R. 801(D)(2)(e).

{¶ 102} The specific evidence of which appellant complains was admitted over appellant's objection during the course of Martin's testimony. Prior to the challenged testimony, the following discussion was held outside the presence of the jury:

> [PROSECUTOR]: Thank you. Your Honor, at this point the State would intend to proceed with questions of Mr. Martin relating to the conversation between Adrian Eaton and Dominique Roberts that occurred at the gas station as well as communications made by Dominique Roberts while he was sending text messages on the outside of 1324 Ironwood communicating with the defendant Justin Wright on the inside of the building.

36.

It's the State's position that these would be admissible as co-conspirator statements. At this stage, the State feels that it has presented a prima facie case of a conspiracy that these individuals, particularly Eaton, Roberts and Wright, acted in concert with one another to commit the offenses of at minimum robbery.

Specifically we received testimony from Shayne Jackson that if believed would indicate that Adrian Eaton and Justin Wright were inside the apartment when Dominique Roberts entered, tapped one of Shayne's friends on the head with a gun and said nobody move. That subsequent to that, Adrian Eaton stood up and began taking property from Shayne and Shayne's friends.

The State would note that after saying nobody move, that Dominique Roberts did not appear to react negatively to Adrian Eaton moving and doing things in furtherance of the robbery.

We also received testimony from Shayne Jackson that Justin Wright stood and got a gun and said, do you think this is a game, before beginning to fire bullets. And that after the shooting started, Adrian Eaton, Justin Wright and Dominique Roberts all appeared to leave together.

When we combine this with what we have learned from Mr. Martin, that everybody arrived together and that Dominique Roberts entered the

apartment with this firearm drawn, the State feels that the evidence presented is sufficient to make a prima facie case of conspiracy. If believed, the jury would be entitled to infer that these individuals were working together to commit this robbery offense and that as such, statements that they made to each other in furtherance of that offense would be admissible, they would be non-hearsay statements because co-conspirator statements are defined as non-hearsay and they would not violate the Confrontation Clause. * * *

THE COURT: Thank you. Would you like to respond, [defense counsel]?

[DEFENSE COUNSEL]: Judge, there was testimony elicited and taken that a crime occurred. It doesn't extend to the fact that there was a conspiracy that it occurred. Much of the information that was given could be questionable and it is to be weighed by the jury.

{¶ 103} Upon reviewing the evidence relied upon by the state, the trial court agreed that there was sufficient evidence to establish the existence of a conspiracy. Applying Evid.R. 801(D)(2)(e), the trial court found that Martin's anticipated testimony would not constitute hearsay and was therefore admissible. Consequently, the trial court overruled appellant's objection to the testimony.

38.

**{¶ 104}** Thereafter, the state proceeded to question Martin as to the statements he overheard from the conversation between Eaton and Martin at the gas station, as follows:

Q. So Mr. Martin, a moment ago I said we would come back to the conversation at the gas station. I'd like to go back to that. So you said after you left Ironwood the first time, you went to Arden Place and then to the gas station. Do I have that sequence correct?

A. Yes.

Q. When you got to the gas station, did anyone get out of the car?

A. Yes.

Q. Who was that?

A. Justin Wright.

Q. And where did Justin Wright go?

A. He walked up to the window of the gas station.

Q. And who stayed in the car?

A. It was me, Adrian Eaton and Dominique Roberts.

Q. And were Dominique Roberts and Adrian Eaton talking?

A. Yes.

Q. Could you hear what they were talking about?

A. Yes.

Q. What were they talking about?

39.

A. Dominique –

[DEFENSE COUNSEL]: Objection, Your Honor. Your Honor, I would just renew my objection based on hearsay.

THE COURT: Thank you and the objection's overruled.

Q. So Mr. Martin, what were they talking about?

A. Adrian had turned around and asked Dominique, he said something and then Dominique said why didn't we rob them, we was just there.

Q. And what happened then?

A. And then Justin had came, got back to the car.

Q. Mr. Martin, when was the first time that evening that you heard about a robbery happening?

A. At the gas station.

{¶ 105} Here, appellant asserts, as he did before the trial court, that the foregoing testimony was inadmissible hearsay. The state responds by arguing that Eaton's statement ("why didn't we just rob them, we was just there") constituted a statement by appellant's co-conspirator and thus Martin's testimony about the statement was non-hearsay under Evid.R. 801(D)(2)(e). But appellant insists that "at the time the statement was allowed into evidence during the trial, the state had not made independent proof of a conspiracy, such that the admission was both improper and highly prejudicial." Thus, the

40.

issue we must resolve is whether the evidence in the record at the time of Martin's testimony was sufficient to establish a conspiracy and trigger the non-hearsay provision of Evid.R. 801(D)(2)(e).

{¶ 106} Pursuant to Evid.R. 801(D)(2)(e), the statements of a co-conspirator are not admissible until the state has made "a prima facie showing of the existence of the conspiracy by independent proof." *State v. Carter*, 72 Ohio St.3d 545, 550, 651 N.E.2d 965 (1995); *State v. Hand*, 107 Ohio St.3d 378, 2006–Ohio–18, 840 N.E.2d 151, ¶ 100. "However, the early admission of statements which may otherwise constitute inadmissible hearsay is 'rendered harmless, [when] independent proof of the conspiracy [is] admitted into evidence before the case [is] submitted to the jury.'" *State v. Taylor*, 6th Dist. Lucas No. L-15-1151, 2016-Ohio-5862, ¶ 18, quoting *State v. Jalowiec*, 91 Ohio St.3d 220, 227, 744 N.E.2d 163 (2001).

{¶ 107} To establish independent proof of a conspiracy, the prosecution must provide proof: "(1) of the existence of a conspiracy; (2) of the defendant's participation in the conspiracy; (3) of the declarant's participation in the conspiracy; (4) that the statement was made during the course of the conspiracy; and (5) that the statement was made in furtherance of the conspiracy." (Citation omitted.) *State v. Baker*, 137 Ohio App.3d 628, 653, 739 N.E.2d 819 (12th Dist.2000). "A prima facie case is made where the evidence introduced is sufficient to support, but not compel, a particular conclusion, and which only furnishes evidence that the jury may consider and weigh, but need not

41.

accept." *State v. Donaldson*, 6th Dist. Wood No. WD-13-038, 2014-Ohio-3621, ¶ 16, citing *State v. Braun*, 8th Dist. Cuyahoga No. 91131, 2009-Ohio-4875, ¶ 107.

{¶ 108} Here, the state introduced the testimony of several witnesses prior to calling Martin to testify. One of these witnesses, Jackson, provided testimony that is especially relevant to the issue before us. Jackson testified that he was present at Carr's apartment on the morning of the shooting, and he recounted the fact that appellant arrived at the apartment at the same time as Eaton. Jackson stated that Roberts subsequently entered the apartment with a firearm in hand, said "nobody move," and began pacing around the living room. Meanwhile, Eaton began removing items from everyone's pockets, including Jackson's wallet and mobile phone. At the same time, appellant was standing in the room with a cocked firearm in his hand. Eventually, appellant fired his weapon after he became visibly frustrated and asked Jackson and his friends if they thought he was playing a game.

{¶ 109} Martin's testimony also supports the conclusion that appellant was engaged in a conspiracy to commit a robbery at Carr's residence with Roberts and Eaton. Eaton and appellant ignored Roberts' statement directing everyone not to move, and instead helped to facilitate the robbery initiated by Roberts by raiding the pockets of the other men and, in appellant's case, standing by with a firearm in his hand and ensuring compliance with Roberts' instructions. This evidence was supplemented by Martin's earlier testimony in which he implicated himself as part of the conspiracy by stating that

42.

he was the driver of the vehicle used by the group to travel to and from Carr's residence on the morning of the shooting.

{¶ 110} From the foregoing testimony, a reasonable fact finder could conclude that appellant, Martin, Eaton, and Roberts were co-conspirators in the robbery that took place at Carr's residence. Further, the timing of Eaton's statement, right before the group returned to Carr's residence to commit the robbery, plainly establishes that the statement was made during the course of the conspiracy and in furtherance of the conspiracy. Thus, the state made a prima facie showing of a conspiracy prior to soliciting testimony from Martin regarding statements he overheard from the conversation between Eaton and Roberts at the gas station.

{¶ 111} In light of the state's prima facie showing, we find that the trial court properly found Martin's testimony admissible under Evid.R. 801(D)(2)(e). Accordingly, appellant's second assignment of error is not well-taken.

### D.    Denial of Appellant's Crim.R. 29 Motion

{¶ 112} In appellant's third assignment of error, he argues that the trial court erred in denying his Crim.R. 29 motion.

{¶ 113} Appellate review of a disputed denial of a Crim.R. 29 motion for acquittal is governed by the same standard employed in determining whether a verdict is supported by sufficient evidence. *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37. Resolving challenges to the sufficiency of the evidence requires

43.

consideration of whether, when the evidence is examined in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). The appellate court must assess whether the evidence, if believed, would support a conviction. *Jenks* at paragraph two of the syllabus.

{¶ 114} Here, appellant's sufficiency argument is limited to his conviction for aggravated burglary under R.C. 2911.11(A)(2), which provides:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> * * *
>
> (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶ 115} In his brief, appellant acknowledges that he entered Carr's residence with a firearm in his possession. Further, there is no dispute that appellant shot Carr while inside the residence. However, appellant argues that the state's evidence was insufficient to establish that he was a trespasser in Carr's residence on the morning of the shooting.

44.

According to appellant, there is no evidence in the record that he used force, stealth or deception to enter Carr's residence, but instead "the testimony [at trial] indicated that Wright was an invited guest of Carr."

{¶ 116} As used in the aggravated burglary statute,

"Deception" means knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact.

R.C. 2913.01(A); *see also In re Meachem*, 10th Dist. No. 01AP-1122, 2002-Ohio-2243, ¶ 18 (applying this definition of deception to burglary).

{¶ 117} Relying upon his claim that Carr invited him into the residence, appellant insists that he could not be considered a trespasser. On the contrary, "[m]erely because one has permission to enter a residence does not negate the trespass element where the defendant gained permission by lying to the resident about why he wishes to enter." *In re J.M.*, 7th Dist. Jefferson No. 12 JE 3, 2012-Ohio-5283, ¶17. A similar argument was considered and rejected by the court in *J.M.*, where the defendant gained entrance into a home by falsely claiming that he needed to use the restroom. *Id*. at ¶ 18.

45.

{¶ 118} Likewise, the Third District rejected the argument of a defendant who claimed that "because he was invited in to [the victim's] apartment, he was not a trespasser." *State v. Dukes*, 3d Dist. Nos. 1-02-64, 1-02-92, 1-02-93, 2003-Ohio-2386, ¶ 23. There, the record established that the defendant "lied about being sent upstairs * * * to make a phone call, lied about [being] dropped * * * off at [the victim's apartment], and fabricated the phone call." *Id.* Given those facts, the Third District concluded that appellant used deception to gain entry into the apartment and upheld the defendant's burglary conviction. *Id.*

{¶ 119} At trial in the present case, the state's evidence included testimony from Jackson, which established that appellant and Eaton were granted permission to reenter Carr's residence in order to purchase marijuana from Carr. The fact that appellant and Eaton did not depart from the residence after the purchase of marijuana was complete suggests that appellant's desire to purchase marijuana was only a pretext that appellant used to gain entrance into the residence.

{¶ 120} For his part, appellant testified at trial that he was at Carr's residence at the time of the shooting in order to "purchase one gun and trade another." This stated purpose is also inconsistent with appellant's conduct after Roberts entered the residence and stated "nobody move." At this point, appellant stood up, drew his firearm, and acted as an enforcer who was seemingly operating in concert with Roberts and Eaton to facilitate the group's criminal conduct.

46.

{¶ 121} On this record, we find that the state introduced sufficient evidence to prove that appellant entered into Carr's residence by deception. Therefore, there is no merit to appellant's argument that the state failed to introduce sufficient evidence to show that he trespassed inside Carr's residence. With this in mind, we find that the trial court properly denied appellant's Crim.R. 29 motion as to burglary in violation of R.C. 2911.21(A)(1).

{¶ 122} Accordingly, appellant's third assignment of error is not well-taken.

### E. Sentencing Issues

{¶ 123} In his fifth assignment of error, appellant argues that the trial court erred in failing to merge all of his convictions as allied offenses of similar import.

{¶ 124} Whether offenses are allied offenses of similar import is a question of law that this court reviews de novo. *State v. Roberson*, 2018-Ohio-1955, 113 N.E.3d 204, ¶ 12 (6th Dist.).

{¶ 125} Ohio's multiple-count statute, R.C. 2941.25, provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses

47.

of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 126} In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, the Ohio Supreme Court set forth the following three-part test to determine whether a defendant can be convicted of multiple offenses:

As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Id.* at ¶ 31.

{¶ 127} Here, appellant was sentenced separately for (1) aggravated murder in violation of R.C. 2903.01(B), which prohibits one from purposely causing the death of another with prior calculation and design, (2) aggravated robbery in violation of R.C. 2911.01(A)(1), which prohibits one from, among other things, brandishing a firearm in attempting or committing a theft offense, and (3) aggravated burglary in violation of R.C.

48.

2911.11(A)(2), which, as we already explained, prohibits one in possession of a deadly weapon from trespassing in an occupied structure when another person is present with the purpose to commit any criminal offense therein. Appellant committed these offenses separately and is thus not entitled to merger.

{¶ 128} In chronological order, appellant committed aggravated burglary first. This offense was completed upon appellant's armed entry into Carr's residence with Eaton with the purpose to commit a theft offense therein. The burglary was complete at the moment appellant entered the apartment by deception, since in order to commit aggravated burglary, "one does not have to actually commit any criminal offense; rather [appellant] simply had to trespass with the purpose to commit a criminal offense." *State v. Lane*, 12th Dist. Butler No. CA2013-05-074, 2014-Ohio-562, ¶ 16. Thereafter, appellant committed the offense of aggravated robbery when he pulled his weapon and assisted Eaton in stealing Jackson's wallet and mobile phone. Finally, appellant committed the offense of aggravated murder when he decided to shoot and kill Carr. Because these offenses were committed by separate conduct that occurred at separate moments in time, they are not allied offenses of similar import. Therefore, we find no merit to appellant's argument that the trial court should have merged these offenses at sentencing.

{¶ 129} Alternatively, appellant contends that the trial court imposed a "needlessly duplicative and arguably gratuitous" sentence when it ordered his individual sentences to

49.

be run consecutively. Appellant does not develop his argument beyond complaining that "consecutive sentences for the substantive offenses are a needless duplication of years of incarceration which are arguably already incorporated in the aggravated murder sentence of 25 years to life." Appellant cites no authority in support of his argument. Moreover, we find that R.C. 2929.14 expressly authorizes the trial court to impose consecutive sentences upon certain findings, all of which were properly made by the trial court in this case. Thus, we find no merit to appellant's alternative argument concerning the imposition of consecutive sentences.

{¶ 130} Finally, as we noted in our recitation of the facts, the parties have entered a joint "stipulated notice of conceded error" informing the court that the trial court's "judgment entry in this case does not include an aggregate minimum and maximum sentence as required by R.C. 2929.144(B)(2)." We will consider the merits of this notice in connection with the other sentencing arguments advanced by appellant in his fifth assignment of error.

{¶ 131} R.C. 2929.144(B)(2) provides,

(B) The court imposing a prison term on an offender under division (A)(1)(a) or (2)(a) of section 2929.14 of the Revised Code for a qualifying felony of the first or second degree shall determine the maximum prison term that is part of the sentence in accordance with the following:

* * *

50.

(2) If the offender is being sentenced for more than one felony, if one or more of the felonies is a qualifying felony of the first or second degree, and if the court orders that some or all of the prison terms imposed are to be served consecutively, the court shall add all of the minimum terms imposed on the offender under division (A)(1)(a) or (2)(a) of section 2929.14 of the Revised Code for a qualifying felony of the first or second degree that are to be served consecutively and all of the definite terms of the felonies that are not qualifying felonies of the first or second degree that are to be served consecutively, and the maximum term shall be equal to the total of those terms so added by the court plus fifty per cent of the longest minimum term or definite term for the most serious felony being sentenced.

{¶ 132} Here, the trial court ordered appellant to serve two indefinite sentences of 8 to 12 years (for aggravated robbery and aggravated burglary), and ordered those sentences to be served consecutively to one another and consecutive to the sentence of 25 years to life for aggravated murder. Notably, the trial court did not calculate an aggregate minimum and maximum sentence as required under R.C. 2929.144(B)(2). Since the record reflects that appellant's sentence did not include the required aggregate minimum and maximum sentencing range, we must "remand the case to the trial court so that the R.C. 2929.144 aggregate sentencing range can be determined and imposed directly by the

51.

trial court, in order to rectify the incomplete sentence previously imposed by the trial court." *State v. Martinez*, 6th Dist. Lucas No. L-21-1020, 2021-Ohio-3994, ¶ 38.

{¶ 133} In light of the foregoing, we find no merit to appellant's arguments concerning the trial court's handling of merger or consecutive sentencing. However, we find that the trial court erred at sentencing when it failed to include the required aggregate minimum and maximum sentencing range in appellant's sentence. On this limited basis, we find appellant's fifth assignment of error well-taken.

### III. Conclusion

{¶ 134} In light of the foregoing, the judgment of the Lucas County Court of Common Pleas is affirmed, in part, and reversed, in part, and this matter is remanded to the trial court for the limited purpose of calculating and imposing the R.C. 2929.144 aggregate sentencing range. The costs of this appeal to be split equally by the parties pursuant to App.R. 24.

Affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.

_____
                                                                    JUDGE

Christine E. Mayle, J.

_____
Myron C. Duhart, P.J.                                JUDGE
CONCUR.

_____
                                                                    JUDGE


This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.